UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | | |
|---|---|---|
| REGINA METALSKI, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 6: 16-51-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| NANCY A. BERRYHILL, * | ) | **MEMORANDUM OPINION** |
| Acting Commissioner of Social Security, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

*** *** *** ***

This matter is pending for consideration of cross-motions for summary judgment filed by the parties. [Record Nos. 8 and 9] Plaintiff Regina Metalski contends that the administrative law judge ("ALJ") assigned to her case erred by denying her claims for supplemental security income benefits ("SSI"). She requests that the Defendant's decision be reversed and that she be found totally and permanently disabled. In the alternative, Metalski requests that her case be remanded for a rehearing to address the alleged errors. Nancy A. Berryhill, Acting Commissioner of Social Security, contends that the ALJ's decision is supported by substantial evidence and should be affirmed.

For the reasons discussed below, the Court will grant the Commissioner's motion [Record No. 9] and deny the relief sought by Metalski [Record No. 8].

---

\*       As of January 23, 2017, Nance A. Berryhill is the Acting Commissioner of Social Security, and is substituted as the defendant in this action pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

-1-

**I.**

On March 19, 2013, Metalski filed an application for SSI under Title XVI of the Social Security Act ("the Act"), alleging a disability beginning on March 1, 2008.[1]  [*See* Administrative Transcript, "Tr.," at 131-34.]  The Social Security Administration ("SSA") denied her application initially and upon reconsideration.  [Tr. at 63, 78]  Metalski pursued and exhausted her administrative remedies with a hearing before the ALJ [Tr. at 29], a written decision from the ALJ [Tr. at 8], and review by the Appeals Council [Tr. at 1].  Her case is now ripe for review pursuant to 42 U.S.C. § 1383(c)(3).

Metalski was 39 years-old at the time of the ALJ's decision.  [Tr. at 22]  Metalski claims to having completed the twelfth grade and attending cosmetology school for three years.  [Tr. at 150, 163]  At other times, however, she reported only a ninth-grade education. [Tr. at 34] Metalski claims to having worked as a manager at Dunkin Donuts, as an assistant manager and cashier at Rite Aid, at a deli, and cleaning houses.  [Tr. at 36, 150, 169, 607]  She quit working in 2007 around the time she was recommended for back surgery.  Metalski never returned to work. [Tr. at 14, 162] Metalski contends that she is unable to work because of back problems, pinched nerves, carpal tunnel, and depression.  [Tr. at 162]

Dr. David Winkle, a state agency consultant, examined Metalski in May 2013.  [Tr. at 454-60] Dr. Winkle observed that Metalski had no apparent gait disturbance, and that she had normal strength in her upper and lower extremities.  [Tr. at 457]  Winkle noted a history of carpal tunnel in her left side, which may cause impairment of repetitive griping and grasping. [*Id.*]  Winkle cited a 2009 MRI which revealed a pinched nerve at L4-L5 and bulging disc at

---

[1]    A previous application for benefits was denied on June 20, 2008, and is considered final.  [Tr. at 11]

that level.  [Tr. at 455]  He noted a diagnosis of back pain secondary to degenerative disease, and bilateral neuropathy related to degenerative disc disease.  [Tr. at 457]  As a result of her back pain, Winkle noted that heavy lifting, bending, and stooping may be difficult, but that Metalski should be able to lift and handle 30 pounds occasionally and 15 pounds more frequently.  [*Id.*]  He found that prolonged standing and prolonged sitting would be difficult, with a need to change positions every 30 minutes, and that she should be able to stand and walk for at least 4 hours in an 8-hour day.  [*Id.*]  Winkle also noted Metalski's mental status as normal, her mood and affect were appropriate, and she related normally to the examiner.  [Tr. at 456]

Brian McLean, M.S., L.P.P., a state agency consultant, performed a psychological evaluation of Metalski in June 2013.  [Tr. at 461-66]  McLean found that Metalski's fund of knowledge was low, but that she evidenced concrete thinking.  [Tr. at 464]  He further found that Metalski's judgment, when testing for a hypothetical situation, and reality testing, was adequate.  [*Id.*]  However, McLean indicated that Metalski had gaps of insight and her decision making was confused.  [*Id.*]  He also noted her reports of paranoia, with statements that she often hears voices that bad things will happen.  [*Id.*]

McLean conducted a Wechsler Adult Intelligence Test, and concluded that Metalski had a full-scale IQ score of 44, reflecting a very low range of functioning.  [*Id.*]  McLean noted Metalski's GAF score to be 42.  [Tr. at 465]  As a result, he found marked impairment of the claimant's capacity to understand, remember, and carry out instructions for simple repetitive tasks; marked impairment of her ability to tolerate stress and pressure of day-to-day employment; marked impairment of her ability to sustain attention and concentration towards

performance of simple repetitive tasks; and marked impairment of her ability to respond appropriately to supervision, coworkers, and the pressure of a work setting. [Tr. at 465-66]

State agency psychologist Dr. Mary Thompson, Ph.D., reviewed Metalski's medical records in August 2013 and determined that the claimant did not suffer from a medically-determinable mental impairment. [Tr. at 58] Thompson found the earlier-reported findings to be contradicted by Metalski's work history, social media activities, and demonstrated independent ability to carry out daily tasks, such as use of an EBT card, completing purchases, and use of detailed language. [*Id.*] Based on other available evidence, Thompson concluded that Metalski gave poor effort during her psychological evaluation, and that the report of her functioning was feigned. [*Id.*]

In October 2013, state agency psychologist Dr. Lea Perritt, Ph.D., reached a similar conclusion in reviewing Metalski's file. [Tr. at 73] Perritt found that Metalski's presentation at her examination is contradicted by many other factors, including the CDI investigation, work history and adaptive skills over time, and educational attainment. [*Id.*] Perritt likewise found that Metalski has no medically determinable mental impairment.

Metalski's was referred to Edward Lovelace, M.S., by her attorney for an additional psychological evaluation in October 2014. [Tr. at 596] Lovelace reported a full-scale I.Q. score of 52, again placing the claimant in the extremely low range of functioning. [Tr. at 598] In reaching this conclusion, Lovelace noted significant difficulties with verbal and nonverbal concept formations, a limited long-term memory, and difficulty drawing upon past experiences in reaching solutions to current problems. [Tr. at 599] Lovelace also recorded Metalski's statement that she has never been employed for more than two months, with her previous employment including stocking shelves at a pharmacy and cleaning houses. [Tr. at 597]

ALJ Tommye Mangus determined that Metalski had the following severe impairments after reviewing the record and considering the testimony presented at the administrative hearing: severe degenerative conditions of the lumbar spine, possible carpal tunnel syndrome, post-traumatic stress disorder ("PTSD"), depression, and likely borderline intellectual functioning. [Tr. at 17] Notwithstanding these impairments, the ALJ determined that Metalski had the residual functional capacity ("RFC") to perform medium work, except that she could perform no more than frequent left handling or fingering. [Tr. at 20] With respect to mental limitations, the ALJ found that Metalski could understand, remember, and carry out simple instructions and tasks; tolerate occasional, casual contact with coworkers, supervisors, and the public; and adapt to occasional, gradually introduced changes. [*Id.*]

The ALJ determined that there were jobs existing in significant numbers in the national economy that Metalski could perform, including industrial cleaner, laborer, and dining room attendant. [Tr. at 23] Accordingly, the ALJ concluded that Metalski was not disabled from March 19, 2013 (the date her application was filed), through May 19, 2015 (the date of the decision). [Tr. at 23-24]

## II.

Under the Social Security Act, a "disability" is defined as "the inability to engage in 'substantial gainful activity' because of a medically determinable physical or mental impairment of at least one year's expected duration." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007) (citing 42 U.S.C. § 423(d)(1)(A)). A claimant's Social Security disability determination is made by an ALJ in accordance with "a five-step 'sequential evaluation process.'" *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642 (6th Cir. 2006) (en banc) (quoting 20 C.F.R. § 404.1520(a)(4)). If the claimant satisfies the first four steps of the

process, the burden shifts to the Commissioner with respect to the fifth step. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).

A claimant must first demonstrate that she is not engaged in substantial gainful employment at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant must show that she suffers from a severe impairment or a combination of impairments. 20 C.F.R. § 416.1520(c). Third, if the claimant is not engaged in substantial gainful employment and has a severe impairment which is expected to last for at least twelve months and which meets or equals a listed impairment, she will be considered disabled without regard to age, education, and work experience. 20 C.F.R. § 416.920(d). Fourth, if the claimant has a severe impairment but the Commissioner cannot make a determination of the disability based on medical evaluations and current work activity, the Commissioner will review the claimant's residual functional activity ("RFC") and relevant past work to determine whether she can perform her past work. If she can, she is not disabled. 20 C.F.R. § 416.920(f).

Under the fifth step of the analysis, if the claimant's impairments prevent her from doing past work, the Commissioner will consider her RFC, age, education, and past work experience to determine whether she can perform other work. If she cannot perform other work, the Commissioner will find the claimant disabled. 20 C.F.R. § 404.416.920(g). "The Commissioner has the burden of proof only on 'the fifth step, proving that there is work available in the economy that the claimant can perform.'" *White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 785 (6th Cir. 2009) (quoting *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999)).

A court reviewing a denial of Social Security benefits must only determine whether the ALJ's findings were supported by substantial evidence and whether the correct legal standards

were applied. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Substantial evidence is such relevant evidence as reasonable minds might accept as sufficient to support the conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). The Commissioner's findings are conclusive if they are supported by substantial evidence. 42 U.S.C. § 405(g).

### III.

#### A.  The ALJ did not err in weighing and rejecting the consultative examiners' opinions.

The claimant alleges the ALJ improperly rejected consultative examiners' and treating medical source opinions. "The Social Security Administration defines three types of medical sources: non-examining sources, non-treating (but examining) sources, and treating sources." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 273 (6th Cir. 2015) (citing 20 C.F.R. § 404.1502). Here, the ALJ considered only the latter two categories because Metalski had no treating source opinions. [Tr. at 22] In the absence of treating source opinions, examining source opinions are generally given greater weight than non-examining source opinions. *See* 20 C.F.R. § 416.927. ALJ's have more discretion in considering non-treating source opinions. Notably, they need not give reasons for discounting non-treating source opinions. *See Martin v. Comm'r of Soc. Sec.*, 658 F. App'x 255, 259 (6th Cir. 2016) ("But because Dr. Rutledge and Dr. Joslin are non-treating sources, the reasons-giving requirement is inapplicable to their opinions."); *see also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) ("[T]he SSA requires ALJs to give reasons for only treating sources."); *Reeves,* 618 Fed. App'x at 273 (same). The ALJ gave greater weight to non-examining source opinions, discounting examining source opinions, as is permissible. He also provided reasons for this determination.

Because the objective evidence supports the ALJ's weighing of the evidence and opinions, he did not err as a matter of law.

The ALJ gave no weight to agency consultative examiner Dr. Winkle's opinion that, because of Metalski's back problems, "heavy lifting, bending, and stooping may be difficult," "but she should be able to lift and handle 30 pounds occasionally and 15 pounds more frequently." [Tr. at 20] He also rejecting the opinion that Metalski could stand and walk at least 4 hours in an 8-hour day, and that she should avoid unprotected heights "[due to] her neuropathy." [*Id.*] The ALJ found the claimant's CT and MRI scan "demonstrate only minor degenerative lumbar changes," and that "neurological examination findings are negative." [*Id.*] Further, he noted Winkle's "essentially normal examination findings," and found the neuropathy diagnosis to be based only on Metalski's statements. [Tr. at 20-21, 14] The ALJ credited Winkle's left Phalen's findings as the basis for his left hand manipulative limitations. [Tr. at 22] However, he found Winkle's opinions on other limitations to be "based on claimant's report of symptoms" and "simply not supported by the medical evidence as a whole." [*Id.*]

The ALJ's rejection of Dr. Winkle's and the other examiners' opinions was largely due their reliance on Metalski's statements. The ALJ gave numerous reasons for doubting Metalski's credibility and for finding that the results of the IQ tests were feigned. This credibility determination was based on substantial record evidence, including treatment notes from Metalski's numerous emergency room visits, follow-up appointments thereafter, and a pattern of inconsistent statements. For example, in September 2013 Metalski saw neurosurgeon Magdy El-Kalliny for reported severe lower back pain. [Tr. at 14] But examination results were "entirely normal" except for sacroiliac tenderness and an MRI

revealing two "tiny" disc bulges.  [*Id.*]  El-Kalliny proscribed Robaxin, physical therapy, and injections.  [*Id.*]  Metalski never followed-up, but visited the ER the next day for complaints of "back pain down both legs and tingling."  [*Id.*]  She mentioned seeing El-Kalliny, but said that he refused to prescribe her pain medication when she refused injections.  [Tr. at 14-15, 485]

Examination results were again normal, and Metalski was reported as having no trouble getting up out of a chair.  [Tr. at 15]  Drug-seeking behavior was noted after Metalski left the ER without being treated.  [*Id.*, Tr. at 485]  Such behavior is consistent with 2010 ER records from Michigan [Tr. at 267-69, 275], and is a proper basis for doubting Metalski's credibility. *See Jackson v. Comm'r of Soc. Sec.*, No. 1:14-CV-628, 2015 WL 4611472, at *7 (W.D. Mich. July 31, 2015) (listing cases) ("With respect to plaintiff's drug seeking behavior, courts have held that such behavior can form a basis for rejecting a claimant's testimony regarding pain and limitations."); *Simila v. Astrue,* 573 F.3d 503, 519–20 (7th Cir. 2009) (the ALJ could properly reject plaintiff's credibility based on drug-seeking behavior); *Massey v. Commissioner Social Security Administration,* 400 Fed. App'x 192, 194 (9th Cir. 2010) ("the ALJ's interpretation that [the claimant] is engaged in drug-seeking behavior is a clear and convincing reason for disregarding [their] testimony").

In 2006 Metalski was discharged for one physician's practice after he discovered that she was seeing multiple doctors for pain pill treatment.  [Tr. at 14]  Seeing numerous doctors for this reason is also a basis for doubting credibility.  *See Berger v. Astrue,* 516 F.3d 539, 546 (7th Cir. 2008).  Further, "[a] claimant's misuse of medications is a valid factor in an ALJ's credibility determinations." *Anderson v. Barnhart,* 344 F.3d 809, 815 (8th Cir. 2003).

During a January 2014 medical visit for reports of lower back pain, Metalski was administered a urine test which was positive for seven narcotic substances. [Tr. at 15] This occurred despite Metalski's claim that she was not taking the subject medications. [*Id.*] Metalski did not return for treatment when confronted with the positive drug screening. [*Id.*] This evidence is a strong reason for doubting Metalski's credibility. *See Poppa v. Astrue,* 569 F.3d 1167, 1172 (10th Cir. 2009) ("there is sufficient evidence in the record to support the ALJ's determination that [the claimant's] credibility about her pain and limitations was compromised by her drug-seeking behavior").

There is other evidence that casts doubt on Metalski's credibility. In 2013, Metalski was observed in public at a volunteer event helping build a shelter. [Tr. at 149] When approached by investigators, Metalski was comfortable answering their questions. [Tr.at 151] She removed her sweatshirt over her head without any apparent pain or difficulty. [*Id.*] Metalski told the examiners that she had graduated from high school, spent three years in cosmetology school at Wayne State University, and had worked as a manager at a Dunkin Donuts restaurant for five years. [Tr. at 150] Further, investigators found evidence that Metalski regularly shopped on her own (although one witness reported that she often appeared under the influence or drugs or alcohol), and noted her activities on social media. [Tr. at 152, 148] These observed and documented behaviors contradict the information Metalski provided to agency and retained examiners, and undermine the reports issued by those individuals.

For example, Adanta treatment notes state she was a manager at a Dunkin Donuts restaurant and Rite Aid business in Michigan, but claim she only achieved a 9th grade education, and had obtained a GED. [Tr. at 569] Other Adanta documents show Metalski reporting an 11th grade education, but no GED. [Tr. at 575] Dr. Coffey's treatment notes

from January 2014 show she was a store manager at a Dunkin Donuts location for three years and an assistant manager at Rite Aid for one year. [Tr. at 607] However, Metalski told psychological examiner Lovelace in October 2014 that her employment history consisted only of stocking shelves at a pharmacy and cleaning houses, and that she was never employed longer than two months. [Tr. at 597] This record of inconsistent statements concerning a material fact (i.e., the claimant's past employment and educational attainment), weighs heavily in favor of doubting claimant's credibility. Further, "[a]n ALJ's findings based on the credibility of the applicant are accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).

The ALJ also properly discounted state agency consultant Brian McLean's psychological evaluation as not supported by the record as a whole. McLean conducted a Wechsler Adult Intelligence Test, and found Metalski to have a full-scale IQ score of 44, reflecting a very low range of functioning. [Tr. at 464] He noted her reports of paranoia, with statements that she often hears voices, indicating that bad things will happen. [Tr. at 464] The ALJ found that the overall weight of the medical evidence did not support these findings. [Tr. at 21] He referenced the Adanta treatment notes, which specifically estimated an average intellect, and mentioned the lack of reports of hallucinations anywhere in the Adanta treatment notes. [*Id.*] The ALJ, however, credited McLean's assessment as supported by other evidence regarding panic disorder and abuse history. [Tr. at 22]

The ALJ noted Metalski's "tendency to exaggerate or minimize at will" in connection with his evaluation of the psychological evaluation of Edward Lovelace. [Tr. at 17] Specifically, Metalski told Lovelace that she has never been employed for more than two

months, with her previous employment including stocking shelves at a pharmacy and cleaning houses. [Tr. at 597]  The ALJ pointed out that Metalski's reports to Lovelace of "intense fear, nausea, sweating, accelerated heart rate, smothering, chest pain, and paresthesia two times a week" were much more severe than what was reported to Adanta. [Tr. at 17]  The ALJ noted that Metalski had not been to an emergency room for an anxiety attack, and her depressive symptoms reported to Lovelace did not reflect those reported to Adanta. [*Id.*]

In rejecting McLean and Lovelace's IQ evaluations, the ALJ referenced Metalski's own testimony that she passed a written test for a driver's license and had management work experience. [Tr. at 18]  Further, there was no record of special education classes, and the record as a whole supports that Metalski graduated high school, attended cosmetology school, and was active on social media. [*Id.*]

The ALJ's credibility determinations must be reasonable and supported by substantial evidence. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007).  Further, the ALJ must provide "specific reasons for the finding on credibility, supported by the evidence in the case record." *Id*.  Here, the ALJ's discussion of Metalski's credibility is sufficiently specific to make clear to Metalski and to any subsequent reviewers the weight the ALJ gave to her statements and the reasons for the weight given. *Id*. at 248.  The ALJ's credibility determination is supported by substantial evidence, and that determination, along Metalski's treatment records, provide a firm foundation for rejecting the non-treating examiners' opinions.  In short, the ALJ did not err in weighing and rejecting the agency and retained medical examiners' opinions.

### B. The ALJ's decision is supported by substantial evidence.

Metalski claims that she is entitled to benefits under Listing of Impairment 12.04 Affective Disorder and/or 12.05 Mental Retardation. She alleges meeting four of the 12.04(A) requirements, and two of the 12.04(B) requirements. The claimant notes GAF scores for the foundation of 12.04(B)(1), "marked restriction of activities of daily living," and cites her abnormal work history as a basis for meeting 12.04(B)(4), "repeated episodes of decompensation, each of extended duration."

While Metalski's GAF scores are some evidence of mental deficits that render her disabled, they are not determinative. *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 877 (6th Cir. 2007). GAF scores represent the examiner's judgment of the individual's overall level of functioning. Here, the basis for discounting McLean and Lovelace's evaluations are sufficiently stated. Further, Metalski interviewed that she is responding well to the Adanta treatment [Tr. at 22], and evidence of Metalski's social activities do not support marked restriction of activities of daily living. Contrary to claimant's assertion, decompensation is a medical term unrelated to payment for wages and services. *See Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 659 (6th Cir. 2009) (defining "episodes of decompensation). There is no record evidence of repeated periods of decompensation of extended durations, rendering a claim to the 12.04(B)(4) prong unfounded. The finding that Metalski's impairments do not meet or equivalent listing 12.04 is supported by substantial evidence.

To meet the requirement of listing 12.05(B), a claimant must "establish manifestation of deficits in adaptive functioning prior to the age of 22 and a valid verbal, performance, or full scale I.Q. score of 59 or less." *Dragon v. Comm'r of Soc. Sec.*, 470 F. App'x 454, 460 n.1 (6th Cir. 2012) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(B)). While McLean and

Lovelace both reported full scale IQ scores of less than 59, the ALJ discounted these opinions for good and valid reasons. And regardless of whether Metalski met one of Listing 12.05's severity prongs, *see Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001), she failed to meet the diagnostic description of having the deficit in adaptive functioning manifest itself in the developmental period. *Id.*

The Detroit School System has no record of Metalski being enrolled in special education classes. [Tr. at 469] Metalski reported spending three years enrolled in a cosmetology program, and she passed a written driver's license exam. [Tr. at 150, 35] Further, she reported being a manager at Rite Aid for two years and at Dunkin Donuts for four years. [Tr. at 569, 607] Not only did Metalski fail to provide any evidence to meet the diagnostic description, but ample record evidence exists to refute such a classification. The finding that Metalski's impairments do not meet or equivalent listing 12.05 is supported by substantial evidence. *See McDonald v. Sec'y of Health & Human Servs.*, 786 F.2d 1165, 1986 WL 16598, at *5 (6th Cir. 1986) (unpublished table opinion) ("[T]he Secretary properly considered claimant's academic success, occupational success, independent living, and ability to care for herself as evidence that the 66 IQ test result was not representative of claimant's intelligence.").

Finally, the ALJ acknowledged Metalski's degenerative disc disease, the existence of which is supported by the record. [Tr. at 13] However, the ALJ discounted the severity of pain and its effects on her functioning, the allegations of which are not supported by the record. [Tr. at 22] While seeking medication for her back pain, Metalski refused epidural injections. [Tr. at 481] Further, she was found at an event assisting with building a shelter. [Tr. at 149-50] The ALJ did not err in finding that Metalski's subjective allegations of pain were

inconsistent with her underlying condition. *See Gronda v. Sec'y of Health & Human Servs.*, 856 F.2d 36, 39 (6th Cir. 1988). Accordingly, for the reasons outlined above, it is hereby

**ORDERED** as follows:

1. Defendant Nancy A. Berryhill's Motion for Summary Judgment [Record No. 9] is **GRANTED**.

2. Plaintiff Regina Metalski's Motion for Summary Judgment [Record No. 8] is **DENIED**.

3. The administrative decision will be **AFFIRMED** by a separate judgment entered this date.

This 7th day of March, 2017.

Signed By:
*Danny C. Reeves* DCR
United States District Judge